In the Matter of the Estate of BENJAMIN L. M. BATES, Deceased.

Surrogate's Court, New York County, April 30, 1938.

*Bertram L. Kraus* [*M. Claiborne Mebel* of counsel], for the executors.

*Foster & Newman,* for Mary H. Alexander, legatee.

*Frederick N. Van Zandt,* for Helen M. Bates, objectant.

DELEHANTY, S. All objections of Mary H. Alexander having been withdrawn, there remain for disposition only the objections of Helen M. Bates. Her fourteenth objection is sustained. The proceedings in this court have consistently referred to objectant as Helen M. Bates, the name by which she was addressed by deceased. There is no warrant for the apparently gratuitous effort to apply some other designation to her. Her objections which deal generically with the acts of the executors respecting the real property in the estate must be overruled. These objections are based on the legal theory that the will makes a specific devise of the real property and that as a consequence no charges thereon may be paid out of the general assets. The fifth paragraph of the will specifically empowers the executors to take possession of the real estate for the purpose of liquidating the estate, of paying the debts of deceased

and of distributing the surplus in the estate. This paragraph gives the executors a full power of sale. The powers thus granted plainly authorize the executors to use the general assets for the purpose of preserving and maintaining the real property which is the chief asset of the estate. This real property passed by the usual general residuary clause and the language there used does not suffice to make the gift a specific one. (*Crawford* v. *McCarthy,* 159 N. Y. 514; *Calkins* v. *Calkins,* 1 Redf. 337; *Matter of Gavey,* 147 Misc. 332; *Conway* v. *Shea,* 282 Mass. 25; 183 N. E. 717; 88 A. L. R. 553, 563.) Objection eighth is overruled. The estimates carried in the account respecting prospective administration expenses and losses during administration are without binding force. Any expenditure in the future must be justified in a later accounting. Since no credit is here sought by the accountants, no prejudice can come to the objectant. The recitals made in the schedules procure no advantage for the executors hereafter. Objection ninth is overruled, no evidence in support of the objection having been furnished. Objection tenth is overruled on the basis of the evidence taken in the examination before trial which has been marked in evidence. Objection twelfth is overruled on the basis of the testimony given in the examination before trial.

These rulings leave for consideration only the objections which relate to the " lease agreement," to commissions and to the non-payment of objectant's claim. The objections raise once more the questions which are bound to be raised in every case where a fiduciary seeks to enforce the burdensome rule announced in *Matter of Swartz* (162 Misc. 46) and approved in *Matter of Schinasi* (277 N. Y. 252). Comment on various aspects of this rule have been made in *Matter of Kight* (167 Misc. 296) and in *Matter of Mohr* (Id. 523). One of the accounting executors in this proceeding is Irving Trust Company which with Bank of New York and Trust Company, Central Hanover Bank and Trust Company, Chase National Bank and City Bank Farmers Trust Company were the " *amici curiæ* " who aided Chemical Bank and Trust Company in establishing the *Swartz-Schinasi* rule laid down in the prevailing opinion in *Matter of Schinasi (supra).* As is shown in Schedule C of the account here for settlement Irving Trust Company has taken for itself the whole of the five per cent charge which the executors seek to make against what they allege to be rents on the Murray Hill Hotel property. It is claiming the right to take as well two per cent upon the same sums which are reported as rents. The co-executrix, who has actually taken $5,468 as an advance on commissions, also claims two per cent " normal commissions " on the so-called rents so that a total burden of *nine*

per cent is proposed on moneys which are classified by the executors as rents of this property. By authority of the *Swartz-Schinasi* rule this nine per cent in its entirety is computed on the *gross* intake.

The circumstances of this estate exhibit one of the fantastic consequences present if the *Swartz-Schinasi* rule is here controlling. While it is difficult to ascertain the exact figures from the account it is established by the schedules that between the date of their qualification in December, 1935, and February 29, 1936, the executors operated the hotel business which had been carried on by deceased in the Murray Hill Hotel. Their operations must have been conducted at a loss of about $7,000 a month because the shrinkage of the cash on hand can be explained in no other way. During this interval the executors had taken all of the hazards of liability involved in their operation of the hotel. They had to operate a barroom, a pool and billiard room, a cigar stand, a news stand and a restaurant. They had to buy food and supplies for the hotel. They had to supervise, hire and fire employees. They had to assume all the risks of liability to guests for injury to person and property imposed by the laws regulating hotel operation. They were subject to specific requirements of the local laws and ordinances. Since they operated the hotel business at a loss they were not entitled to any commissions whatever. (*Matter of Hayden*, 54 Hun, 197; affd., 125 N. Y. 776; *Beard* v. *Beard*, 140 id. 260; *Matter of Sidenberg*, 204 App. Div. 255.) *The executors do not report their transactions as businessmen* and do not ask for any commissions on the intake or outgo of the hotel business during the period when they operated it. *But they claim that as soon as their responsibility terminated and that when they no longer had either personal risk or business management burden* they became entitled at once to a " management " fee under subdivision 9 of section 285 of the Surrogate's Court Act and to *four* per cent more on the *gross* under the *Swartz-Schinasi* rule. While they had a great deal to do and a great deal at risk they asked and concede that they were entitled to nothing. When they had comparatively little to do and nothing personally at risk they claimed *nine per cent on the gross intake. This averages over $4,000 annually.* They made a so-called lease of the business and property effective March 1, 1936. From and after that date the " management fee " taken by Irving Trust Company ($3,425 — the amount criticized in objection third) represents the labor of a clerk in opening the envelope containing the rent check, of stamping the check for deposit and of entering a sum equal to five per cent of the check on the register of fees for the Irving Trust Company. Separately Irving Trust Company and its co-executor each claim two per cent more on each check under the

*Swartz-Schinasi* rule. Since the attorney for the executors claimed without contradiction that *he* is keeping contact with the hotel operation and is expecting to be paid for his time in this connection there seems to be no other substantial service rendered by the corporate executor than that already listed. The testimony of the assistant vice-president who acted for Irving Trust Company establishes that even the negotiations carried on before the hotel business was " leased " were dominated by the estate attorney. The witness indicated that he had never personally met the broker who acted in the transaction and that his dealings with the " lessee " were chiefly through the medium of the estate attorney. No service at all is suggested on the part of the executrix. The so-called rent of the property is now running at the rate of $46,000 annually and there is being deducted or claimed by these two executors an annual charge of $4,140 on this intake for the handling of twelve separate monthly checks and, presumably, for some undisclosed " management." This rate of charge is $345 per check. As is shown hereafter these charges come out of the *corpus* of the estate because the so-called annual rent fails by $80,000 a year to carry the property. In addition to the nine per cent on gross which these executors in part have taken as " management fee " and which they claim in part as " commissions " there is here a charge of $3,375 paid to a broker in connection with the agreement. The intake for the first year of operation of the agreement was $42,000. The rule in *Matter of Schinasi* of course authorizes a charge of brokerage commissions against gross. Thus, in the first year of operation of this agreement the rule in that case, if applicable, warrants on this brokerage item a further charge of eight per cent on gross. So in this particular year (and assuming the rule in *Matter of Schinasi* applies) there would be a *total charge on gross of seventeen per cent.* If the rule in *Matter of Schinasi* is here applicable this seventeen per cent on gross is taken out of a fund which is *only one-third* of the cost of carrying the property for the year.

Because the executors in the present case for reasons developed below are held by the court to be continuing a business (presently held in what is equivalent to a suspense account) rather than managing real property and taking rents therefrom, the rule of *Beard* v. *Beard* (*supra,* at p. 265) for computing commissions will bear repetition. The Court of Appeals there said: " We think the true rule for allowance of statutory commissions is this: Trustees are entitled to commissions for receiving all moneys which constitute the *corpus* of the estate, and any additions thereto from increase of any kind, and thus the moneys upon which commissions are to be computed can never exceed the gross amount of the estate

and its net income; and the moneys paid out upon which commissions may be computed are the moneys paid out of the estate for debts, expenses of administration and to legatees or other beneficiaries, moneys which operate to diminish the estate as it exists in the hands of the trustees and pass out of and away from the estate. This rule excludes commissions upon investments and reinvestments and moneys disbursed and received in the conduct of a business carried on to produce net income. In the case of such business, the commissions are to be computed on the net income only which came to the *corpus* of the estate as an increase thereof. If this rule does not in all cases give adequate compensation to trustees, no great injustice can flow from its operation, as trustees are not obliged to act and thus execute a trust which would be unprofitable or burdensome to them; and that the rule will operate beneficially in most cases and subserve the best public policy cannot be doubted."

This rule meets all situations and protects all persons for whose benefit primarily estate administrations are conducted. Within the area explicitly covered by the *Swartz-Schinasi* rule the simple and clear *Beard* v. *Beard* rule is modified. Otherwise it still operates as the general and standard rule. In determining whether the *Beard* rule operates here it is useful to notice some of the facts appearing in the record of the *Beard case*. The statement quoted from the *Beard* opinion relates to the claim of right to commissions computed on *gross* income from the so-called Erie Basin property. Schedule M of the account in that case shows that the real property so described was valued at $1,000,000. A stipulation which appears at page 259 of the record in the Court of Appeals shows that aside from this realty the only cash capital employed in the Erie Basin storage and wharfage business was a revolving fund of $5,000 out of which labor payrolls were met. This fund was replenished currently by labor charges collected from customers. The record thus shows that the *business* reported in *Beard* v. *Beard* employed a capital of which ninety-nine and one-half per cent was the realty and one-half of one per cent was cash. The reported rentals received from space in the real property rented to customers aggregated over $600,000. (Schedule N, p. 68 of the printed record.) The gross outgo against this gross intake amounted to over $270,000. (Schedule P-1, p. 79 of the printed record.) Aside from the labor charges of about $150,000 which were all paid out of the revolving $5,000 cash fund, the other charges were largely rebates or payments for shortages. Thus it is clear from the *Beard* record that the net income of about $333,000 (fol. 616, p. 206 of the printed record) could have had no source other than rentals of storage and wharfage

space. Though the real estate constituted ninety-nine and one-half per cent of the capital employed in the business and though the rental of space produced the net profit no commissions on *gross* were allowed. The fact that a *business* is almost wholly a renting business does not invoke the *Swartz-Schinasi* rule nor does it call into operation subdivision 9 of section 285 of the Surrogate's Court Act.

In *Matter of Sidenberg* (204 App. Div. 255) the account (Schedule A) shows the value of the hotel premises, in respect of which the commissions question arose, to have been $850,000. The stipulation of facts filed in the proceeding shows that the ground floor stores were rented on written leases, that twenty per cent of the hotel rooms were under written lease and that fifty per cent more of the hotel rooms were occupied by people who had " been in possession of their respective rooms for long periods of time " — presumably on some oral letting. The stipulation shows that for 1920 the gross intake for the whole building was $475,651.40. Room rentals accounted for $316,314.64 of this total; $49,850.02 came from store rentals. Thus the total rentals for fixed space in the building amounted to $366,164.66, or more than seventy-seven per cent of the total receipts. If the thirty per cent of the rooms not permanently occupied is excluded from the computation of rents, it will be seen that the stable tenancies (store rentals plus seventy per cent of the room rent) equal $271,270.27 or more than fifty-seven per cent of the gross intake. Thus we see in the *Sidenberg* case that the capital used in the enterprise was a parcel of realty worth $850,000 plus, no doubt, some revolving cash fund as in the *Beard* case. The rule in the *Sidenberg* case is that seventy-seven per cent of income produced from lettings of fixed spaces is not subject to a commission's charge on *gross*. So it would seem that the *Swartz-Schinasi* rule is to apply *only where one hundred per cent of the income* is derived from rents and only where neither service nor other capital than realty contributes to the result.

In this connection it should be noted that in *Matter of Schinasi* (p. 267) Chief Judge CRANE said: " It is somewhat difficult at times to draw the line between the management of a large apartment house, including the moneys expended for maintenance, upkeep and repairs, and the running of a business." Since the inception of the *Swartz-Schinasi* rule the trial courts must determine whether the operations reported are purely and exclusively the letting of real property or whether they represent in any aspect a business operation. In the first case the burdensome *Swartz-Schinasi* rule must be imposed; in the second the clear and fair rule of *Beard* v. *Beard* is the standard for action. The problem of selection of the

applicable rule is presented in a peculiarly acute form on this accounting because here the executors say that a creditor with an adjudicated claim cannot be paid anything at all at this time because of exigencies in this estate created in part by the executors' demands for commissions — demands which include a nine per cent charge on the gross sum received by them out of the Murray Hill Hotel premises. Such a situation requires clear demonstration of right on the part of the executors before approval can be given to their demands.

A correct understanding of the business problem which confronted the executors and of their solution of that problem will show that not only does the *Swartz-Schinasi* rule prove to be inapplicable here but subdivision 9 of section 285 of the Surrogate's Court Act is also inapplicable. Deceased individually owned the real estate. He owned as well the hotel business, the liquor business, the pool and billiard room business, the restaurant business and the miscellaneous other businesses carried on therein. He owned individually the glassware, silverware, linens, furniture, petty cash, receivables and the miscellaneous inventory of goods and supplies connected with the operation of the hotel and other businesses. When they qualified the executors were confronted with the problem of selling those businesses and that property. Without the businesses the property would be wholly unproductive. It is clear from the record that the maintenance on the site of a going hotel business and the continuance of the good will of that business would affect in major degree the salability of the real property of deceased. The executors managed the businesses for the purpose of preserving the value in all of the property of the estate connected with the site. In the bargain which they made with the present occupant of the premises they did not rent a piece of real estate merely. The so-called lease into which they entered plainly has for its objective much more than the mere procurement of rent from a piece of real property. It represents a bridging over of a temporary period during which the executors might adjust the affairs of the estate and find a purchaser for the real estate and the going businesses therein. This agreement effected in part a sale of some of the estate assets — the bar and restaurant inventories, for instance. It stabilized the losses at about the same level as that established by the two months' operation of the executors themselves. It protected and preserved the good will of the hotel business. It assured repossession by the executors at the end of the so-called lease period of a fully furnished hotel building with equipment equal to that which they temporarily surrendered to the present occupant for his use. It secured to the estate the equivalent of a managing

agent for the business relieving the estate from the hazard of loss through claims arising from executorial operation. It secured to the estate an opportunity until 1941 to seek for some method of disposal of the realty and the businesses which would permit the realization of something approximating their value. Unless the whole agreement had this as its objective it would be subject to the charge of waste made by objectant. If the executors had made a lease merely and had thereby imposed upon the estate a loss which in no event could have been less during the five years than $400,000 they would have been gravely at fault. To have tied their own hands and to have disabled themselves from reducing the losses incurred by the estate by turning over this hotel operation just at the opening of the prospective profitable season for hotels because of the World's Fair would have been inexcusable unless it had some other objective. This hotel is located practically at the door of one of the railway terminals. It is also at the portals of underground transportation to the World's Fair site. It is substantially certain to have its fair proportion of the profitable business expected from public attendance at the World's Fair. To have turned over that prospect of profit to another person and to have made inevitable the maximum loss would (unless there were compensating advantages) have been basis for denying commissions to these executors altogether on the ground that they had wasted the estate assets. The court prefers to assume that the executors were far-sighted; that they understood that the period of the World's Fair would cause a boom in the hotel business; that they looked forward to the time when this hotel would profit from the boom and when they could take advantage of the psychology of a boom to make a sale of the hotel businesses and land. While they realized that in the event no sale were consummated the occupant would gain great advantages out of this agreement which terminates soon after the closing of the World's Fair, they nevertheless assured themselves of a right of cancellation should their hopes of a sale materialize. The penalty which they would have to pay for cancellation would be a modest tax on the sale proceeds and would not stand in the way of a sale if otherwise one were procurable. In the interval thus bridged by this agreement they assured themselves by its terms that the premises would be operated " as a high-grade residential and commercial hotel, equal in character and repute to moderate priced similar hotels in the City of New York." They had chosen their managing agent with care and they made certain that no mere commercial exploitation of the property and the businesses carried on in it would be possible. They forbade the control of the property and the businesses passing

from their cobargainor and his " associates, whose reputation, character and integrity has been testified to, and is the inducing and controlling cause of the consummation of this agreement." They left open the possibility of assignment by their cobargainor only if a proposed assignee was satisfactory " as to character, reputation and financial standing." They kept control of the minor businesses in the premises by directing that " if any concessions or subleases be made, they shall be made subject to the terms of this lease with a reference to the same." They had $17,325.26 at stake in receivables. They reserved the right to enter upon the realty for the purpose of collecting these moneys. Their cobargainor agreed to give to them " such aid and assistance in the collection thereof as may be necessary." He undertook to pay over to them whatever sums he collected. If their hopes of a sale were disappointed therefore this temporary device for maintaining the businesses of deceased to which they had succeeded would permit them to terminate this rough equivalent of a managing agency and would permit them to resume active charge of these continued businesses of deceased. They were assured by this agreement that the business which they had for sale would be going businesses. The arrangements for the fixed payments were only a part of this broader and more far-sighted plan. In a negative sense they were a measure of a managing agent's compensation. In part they were the purchase price for estate assets.

Since the court interprets the agreement as one which had for its objective this disposal of estate assets it holds that neither the *Swartz-Schinasi* rule nor subdivision 9 of section 285 of the Surrogate's Court Act applies to the moneys heretofore received and still to be received in connection therewith. When and if the program has been completed by a sale of the businesses and when the amount realized by the estate has been ascertained commissions will be computed according to the *Beard* rule. This fair and comprehensive rule says that fiduciaries " are entitled to commissions for receiving all moneys which constitute the corpus of the estate and any additions thereto from increase of any kind, thus the moneys upon which commissions are to be computed can never exceed the gross amount of the estate and its net income; * * * commissions are to be computed on the net income only which came to the corpus of the estate as an increase thereof." When all the factors are known the collections under this contract will be taken into account with other pertinent factors and the commissions of the fiduciaries in respect thereof ascertained in some future accounting.

The conclusions reached herein are based upon a fact finding that the fixed return to the executors under the terms of their bar-

gain with the present management of the businesses operated in the real property of deceased is in none but a verbal sense a rental. Intrinsically the return is not rent. For that reason it has been held that subdivision 9 of section 285 of the Surrogate's Court Act has no application to these moneys. Note should be made of the fact that even if this were a case in which rentals in a true sense were collected from real property (to such rentals the five per cent management fee would apply) there still could not be collected by these executors any normal commissions even under the *Swartz-Schinasi* rule. That rule was formulated in a case where income was available to pay income commissions. Though the commissions in the *Schinasi* case were computed on gross returns they were payable out of net income — there being income available for the purpose. In the course of his prevailing opinion in the *Schinasi* case Judge LEHMAN said: " This court had said before the decision in *Beard* v. *Beard* that * * * ' We are of opinion that where a trustee is required to keep trust funds invested and to receive and pay out the income annually, and he receives the income and renders an account thereof to the beneficiary, and pays over the *balance of the income,* after deducting all expenses chargeable against the same, he has the right to deduct for his compensation full commissions on the income *annually received,* before paying it over.' (*Matter of Mason,* 98 N. Y. 527, 535.) (Italics * * * are new.) "

It is evident that this language presupposes the existence of net income and that it implies that where there is no " balance of the income " against which the fiduciary can charge or from which " he has the right to deduct " his full commissions before paying over the balance, no " normal " commissions whatever would be due. Where real estate does not even pay its taxes the fiduciary will discover that though he may have a basis on which to compute commissions he may have no fund from which they are collectible. It is axiomatic that where realty does not earn its taxes no so-called " normal " commissions can be paid except by invading the corpus of the trust. It would be an inversion of all standard principles of trust administration if capital is charged with income commissions. The courts have in multiple reported cases corrected the accounts of fiduciaries who attempted payment of capital charges out of income or of income charges out of capital. The *Swartz-Schinasi* rule should not be extended beyond the precise facts in the *Schinasi* record unless required by appellate decision. Here the taxes on the premises concededly are in excess of the amount taken in by the executors. Even if that intake is to be treated as rent it is obvious that most of the taxes must come out of capital.

Perhaps some casuist will argue that if only the fiduciary will take his toll from the income before he goes to the tax office with what is left to tender it in part payment of the taxes the deficit thus caused will require an invasion of principal because the taxes are too high and not because the fiduciaries took money which in the first instance should have been devoted to taxes. With that dialectic no business men would agree. The first duty of fiduciaries is to preserve the property in their care from liens superior to the estate interest. The first fund to which they are bound to look for that preservation is the product of the property itself. If they take some of that product for themselves they violate a fundamental of fiduciary duty because they increase to the same degree (or fail to reduce in the same degree) a burden upon the trust *res*. Consequences which compel so gross a trespass upon standard principles of fiduciary administration and which work such damage to the trust *res* should be accepted only if the appellate courts constrain that result.

The rulings here made require the overruling of objections first, second and thirteenth. The court holds that the executors had authority to deal with the real property. It holds that for the reasons stated herein at length the executors should not be surcharged for the temporary disposition of the hotel businesses nor for the making of the agreement criticized in the objection. The court sustains objection third. The amount objected to is to be repaid to the estate. The court sustains objection fourth to the extent of directing that the executor who received improperly an advance payment on account of commissions pay into the estate six per cent interest on the amount of such unauthorized payment to be computed from the date of payment to the date of the decree. Direction to refund the amount would be made except for the fact that commissions in excess of the amount taken are payable to this executor. The court will allow commissions on the basis stated hereafter in connection with the discussion of objection eleventh. Objection fifth is sustained so far as it raises issue as to the principle which underlies the allowance of commissions. The objectant is correct in asserting that the allowance of commissions is for a single service which includes the whole administration. In a proper case and for adequate reasons the courts sometimes allow the withdrawal of commissions before the entire work is done. Withdrawal will here be authorized on the basis hereinafter stated. Objection sixth is overruled except as to the item of $3,425 ordered refunded in connection with objection third. Objection seventh is overruled except to the extent of ordering the payment hereafter directed in connection with objection eleventh. The creditor

is concerned only with payment of her claim. Objections eighth, ninth, tenth and twelfth are overruled. Comment thereon appears earlier in this decision. This leaves for consideration only the problem propounded by objection eleventh.

This objection raises the question whether or not the court in a solvent estate should permit the payment of commissions even on completed transactions at the cost of leaving a creditor with an adjudicated claim wholly unpaid. There is no doubt that in an insolvent estate the ascertainment of a creditor's rights involves a computation of the commissions to be paid. There is no doubt that administration expenses including commissions are a first charge upon the assets. The question here presented is whether priority of administration charges should be permitted to operate so as to give to fiduciaries priority in actual time of payment as well as of right when both debts and administration expenses can be paid in full. If there were doubt of the existence of a fund to pay both creditors and fiduciaries then of necessity the payment to the fiduciaries must be assured since otherwise the work of the estate would not be done properly and creditors would suffer. Here the fiduciaries say that the estate is solvent beyond question but they say, too, that this creditor for whom they are trustees and to whom they owe at least an equal if not a greater obligation than to legatees must stand by while they take available cash substantially equalling the debt and pay themselves their *capital* commissions. The court disagrees with the principle upon which the executors have proceeded in respect of the rights of the objecting creditor. They may not ask the court to allow them to withdraw out of the personalty on hand the money necessary for the payment of their commissions while saying that the balance which would be left of personalty must not be applied in payment of this debt. In effect they are asking the court on this accounting to compel this creditor to wait until the real estate is sold. While the decree of the court directed payment to objectant "when and as funds are available for that purpose " there is nothing in the decree heretofore signed which alters the general rule that a creditor is entitled to be paid if the personalty on hand suffices for that purpose. The executor " holds not in his own right, but as a trustee, for the benefit (1) of the creditors of the testator, and (2) of those entitled to distribution under the will, or if not all bequeathed under the Statute of Distributions." (*Blood* v. *Kane*, 130 N. Y. 514.) " The general rule is that the testator's personal estate * * * constitutes the natural and primary fund for the payment of * * * debts." (*Farmers' Loan & Trust Co.* v. *Kip*, 192 N. Y. 266, 283.) " If the decedent at the time of his death left sufficient personal property

which could have been applied to the payment of his debts and funeral expenses, in the exercise of reasonable diligence on the part of his executors or administrators, then resort cannot be had to the statutes for the sale of his real estate for the payment of his debts. In that event the personal property is the fund for the payment of his debts, and the creditors must resort to that through the executors or administrators. If they waste or·squander the personal property so that it becomes insufficient for the payment of the debts, the only resort of the creditors is to them to enforce their personal responsibility, and they cannot in that case cause the real estate to be sold under the statutes referred to." (*Kingsland* v. *Murray*, 133 N. Y. 170.) Real property may not be ordered sold for the payment of a debt until " it appears that a sale be necessary * * * and that there is deficiency of personal estate within the State." (Surr. Ct. Act, § 238.) Even a charge of a debt upon real property does not discharge the personalty of the primary fund for payment. (2 Jessup Redfield, Surrogates' Courts [1930], p. 1738, and cases there cited.)

The executors here seek to reserve a large amount of personalty for the purpose of paying death taxes which in large part are due to the required inclusion of the real property in the tax schedules. The purpose of the executors is commendable if pursued only to that degree which still permits the rights of creditors to be protected. When the use of personalty for the needs of the realty exceeds that limit it cannot be authorized. For the reasons stated and because it appears upon the face of this account that ample personalty is available for the payment of the claim of objectant the court sustains objection eleventh. The decree to be made will direct payment in full with interest thereon from December 18, 1937.

Commissions will be allowed for receiving with such modification as will conform the basis for computing commissions to the rulings herein made respecting the intake from the businesses operated in the real property of deceased and as will conform the base for computing commissions on securities held in the hands of brokers at the time of death to the requirements of subdivision 7 of rule 10 of the Rules of the Surrogate's Court, New York County. (*Matter of Mills*, 149 Misc. 389, 391; affd., 239 App. Div. 817; affd., 263 N. Y. 574.) Paying out commissions will be allowed on the completed transactions, excluding payments of debit balances in brokerage accounts. Against the commission allowed to Adelaide Roberts is to be credited the advance payment improperly made to her.

Submit, on notice, decree settling the account and directing payment to objectant accordingly.